## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KENNETH SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-269-SLR |
| | ) | |
| STAN TAYLOR, THOMAS CARROLL, | ) | JURY TRIAL DEMANDED |
| FIRST CORRECTIONAL MEDICAL, | ) | |
| INC., DAVID WILKERSON, and | ) | |
| GAIL ELLER, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT THOMAS CARROLL'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

### NATURE AND STAGE OF THE PROCEEDINGS

COMES NOW, Defendant Thomas Carroll, by and through his undersigned counsel, and hereby moves this Honorable Court to grant summary judgment in his favor pursuant to Federal Rule 56. In support of his Motion, Defendant states as follows:

1.    Plaintiff Kenneth Smith ("Smith") initiated this action pursuant to 42 *U.S.C.* § 1983 by filing a Complaint with leave to proceed *in forma pauperis* with the Court on May 15, 2007. (D.I. 1, 2). Smith's Complaint was filed pursuant to 42 *U.S.C.* § 1983 and alleges Eighth Amendment violations of cruel and unusual punishment. *Id.* Smith named as Defendants: Thomas Carroll, Stan Taylor, First Correctional Medical[1] ("FCM") and medical employees David Wilkerson and Gail Eller. The Court granted Smith *in forma pauperis* status on May 24, 2007. ( D.I. 4).

2.    On July 17, 2007, the Court ordered service of process issue upon the Defendants.

---

[1] FCM was the contract medical provider for the DOC from July 1, 2002 until June 30, 2005. Thereafter, Correctional Medical Services ("CMS") has been the contract medical provider.

(D.I. 6). Thereafter, service was executed as to all defendants except Defendants Taylor, Wilkerson and Eller. (D.I. 9). On October 22, 2007, counsel for Defendant Carroll entered an appearance with a request for an enlargement of time of thirty (30) days to file an Answer to the Complaint. (D.I. 12, 13). On October 23, 2007, the request for an enlargement of time was granted. Defendant Carroll answered the Complaint on November 21, 2007 asserting various affirmative defenses, including lack of personal involvement, official and qualified immunities, and failure to state a claim pursuant to § 1983. (D.I. 14).

3. The Court entered a Scheduling Order on March 31, 2008. (D.I. 24). The Scheduling Order also included a Show Cause Order requiring Smith to show cause on or before April 24, 2008 why Defendants Taylor, Wilkerson and Eller should be not dismissed for failure to timely serve process. *Id.* The Court held that failure to timely respond to the Show Cause Order shall result in dismissal of said Defendants from this action. *Id.* On the same date, an Entry of Default in Appearance was entered against Defendant FCM pursuant to Federal Rule of Civil Procedure 55(a) for failure to respond to the Complaint. (D.I. 25).

4. On April 29, 2008, Defendant Carroll propounded Interrogatories and Requests for Production on Smith. (D.I. 27, 28). On or about May 8, 2008, Defendants Taylor, Wilkerson and Eller were terminated from the case pursuant to the Court's Show Cause Order. (D.I. 24). On the same date, Smith filed a Motion for Default Judgment as to FCM and propounded Interrogatories to Taylor.[2] (D.I. 29, 30). On or about June 10, 2008, an Order for Default Judgment was issued as to FCM. (D.I. 34).

5. On or about July 25, 2008, counsel for Defendant Carroll deposed Smith at the James T. Vaughn Correctional Center ("JTVCC") in Smyrna, Delaware.

_____

[2] The requests were responded to by Defendant Carroll as Defendant Taylor was not served in the action and was terminated from the case by Order of the Court. (D.I. 24, 33).

6.     This is Defendant Carroll's Motion for Summary Judgment as to Smith's claims.

## STATEMENT OF FACTS

7.     Smith alleges that he attempted to secure medical treatment for a small bump on his scalp around October 1998. (Complaint, *passim*).  He claims that his scalp problems started upon incarceration.  (Ex. A –  Smith Dep. 27:19-24; 28:1-22).  However, his medical records suggest that his problem began earlier than incarceration.  When Smith arrived at Gander Hill in December 1997, it was noted by medical personnel on his admission data sheet that a rash on the scalp was visually observed.  (Ex. B-1).  Smith's medical records reflect that the "rash" as described by medical personnel and "bump" as described by Smith, has been an ongoing problem and one that has received continuous medical treatment by the DOC medical providers throughout Smith's incarceration.  (Ex. B).

8.     For relief, Smith seeks to have his scalp problem finally resolved.  However, he testified that he does not seek or request treatment from medical personnel at the prison for problems with his scalp.  He claims that this is because after 10 years, they have provided little to no assistance.  (Ex. A – Smith Dep. 32:14-24, 33:1-19).  Smith admitted in his testimony that he was never told that surgery was required, but he alleges that one of the doctors who treated him informed him that surgery was probably the only option for clearing up the problem with his scalp.  (Ex. A – Smith Dep.42:9-23).  There is, however, no evidence in Smith's medical records to support that opinion.

9.     On July 11, 2005, Smith filed a medical slip demanding to see a dermatologist. (Ex. B-4).  He claimed the growth on his head was spreading.  *Id.*  Shortly thereafter, on August 2, 2005, Smith was examined and treated by Dr. Xue at the Cape Henlopen and Nanticoke Dermatology Association. (Ex. B-5, 6). The notes from that visit indicate Smith was injected

with Kenalog, prescribed antibiotics and given topical medication. *Id.* On August 16, 2005, Smith filed a sick call slip claiming he was waiting for his medication that had been prescribed for him at the consult. (Ex. B-7). On August 17, 2005, CMS's progress notes confirm that the "medications were ordered as recommended." (Ex. B-8). On February 6, 2006, CMS's progress notes indicated that Smith's scalp appears improved with no active infection noted. (Ex. B-9). On May 8, 2006, Smith was seen by another dermatologist, Dr. Thomas J. Burke of Panzer Dermatology & Cosmetic Surgery. (Ex. B-10-12). Dr. Burke also administered Kenalog and prescribed minocycline an antibiotic to be taken daily. On September 12, 2006, tetracycline was prescribed for Smith. (Ex. B-13-14).

9.     The DOC contracts with medical providers to provide inmates with medical care. As documented in Smith's medical records, throughout his incarceration he has been routinely examined and treated by DOC medical providers Prison Health Services ("PHS"), FCM, CMS and outside specialists. He has been under the care of medical professionals who have treated him and prescribed medication for a myriad of ailments including his scalp problem. (Ex. A – Smith Dep. 29:1-3). Smith has also been examined and treated by outside dermatologists. (Ex. A – Smith Dep. 33:9-22). Defendant Carroll does not take part in diagnosing, treating or prescribing medications for inmates, and Smith has not identified any constitutional basis for including Defendant Carroll in this suit.

10.     Smith does not know Defendant Carroll personally and could not clarify why he was named as a defendant in this lawsuit. (Ex. A – Smith Dep. 18:1-24; 24:6-24). The sole allegation against Defendant Carroll contained in Smith's Complaint asserts that he "constantly wrote former commissioner Stan Taylor and Warden Carroll. The aforemention constantly ignored." (D.I. 2, par. 2). Smith confirmed in his deposition that this is the only basis for his

claims against Defendant Carroll:

> Q:     Okay.  So the basis for your allegations against Stan Taylor and Tom Carroll were letters written on your behalf to them and you didn't receive a response?
>
> A:     Yes.
>
> Q:     Any other reasons?
>
> A:     No, no.

(Ex. "A" Smith Dep. 19: 22-24, 200: 1-4).

Smith has failed to produce any of these letters in response to Defendant Carroll's Requests for Production (Ex. C), he does not remember when the letters were written, he failed to retain any copies and he testified that he has no recollection of the contents of the letters.  (Ex. A – Smith Dep. 19: 5-24, 20: 1-11).

## **ARGUMENT**

Federal Rule 56(c) permits a Court to grant summary judgment, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The United States Supreme Court holds that a court must enter summary judgment, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celetox Corp. v. Carter*, 477 U.S. 317, 322-23 (1986).

To obtain summary judgment the moving party must demonstrate that he has met the standards of Rule 56(c).  *Carter v. Exxon Company USA*, 177 F.3d 197, 202 (3d Cir. 1999).  The summary judgment standard requires that "the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). Thus, only disputes that affect the outcome of a lawsuit will properly preclude the grant of summary judgment. *Id.*

"At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. In deciding a motion for summary judgment "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252.

## I.    Smith Cannot Establish an Eighth Amendment Claim Against Defendant Carroll.

Smith's Eighth Amendment claim against Defendant Carroll must fail. Defendant Carroll was not personally involved in any of the allegations contained in the Complaint and he cannot be held liable on the basis of *respondeat superior*. Smith also cannot establish that Defendant Carroll was deliberately indifferent to his medical needs.

### A.    Smith's claims must fail because Defendant Carroll was not personally involved in the alleged wrongs and his liability cannot be based on *respondeat superior*.

To support a claim for a civil rights violation pursuant to section 1983, a plaintiff must show that the defendant had *personal involvement* in the alleged wrongs. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (emphasis added). A plaintiff must prove that the accused official "played an affirmative role in the deprivation of the plaintiff's rights, i.e., there must be a causal link between the actions of the responsible officials named and the challenged misconduct." *Pennsylvania v. Porter*, 659 F.2d 306, 336 (3d Cir. 1981). It is also well established that section 1983 will not support a claim based on the theory of *respondeat superior*

or vicarious liability.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981).  In addition, this Court

has held that, "[g]rievances are not enough to impute knowledge to [a] defendant."  *Brookins v.*

*Williams*, 402 F.Supp.2d 508, 512 (D. Del. 2005) (quoting *Rode*, 845 F.2d at 1208)).

There is no allegation or evidence that Defendant Carroll was personally involved in any

wrongdoing alleged in the Complaint and thus he cannot be held liable under Section 1983.

During discovery, Smith was unable to provide any evidence or information indicating that

Defendant Carroll was aware of his medical requests or medical condition.  Smith testified that

he has not met Defendant Carroll and does not know what he looks like.  Smith has been unable

to articulate, or provide evidence to support, a causal link between any action of Defendant

Carroll and any wrongdoing against Smith.  *See Murphy v. Kearney*, 2004 WL 878467 (D. Del.

April 19, 2004) (Ex. "D") (prison warden entitled to summary judgment where there were no

allegations of personal involvement); *Gregory v. PHS Inc.*, 2001 WL 1182779 (D. Del. Sept. 21,

2001) (Ex. "E") (Department of Correction Commissioner and prison warden entitled to

summary judgment where there were no specific allegations of misconduct).

To the extent that Smith seeks to hold the Defendant liable based on his "higher" or

supervisory positions, such liability is not permitted under § 1983.  *Rode*, 845 F.2d at 1207.  And

absent any evidence that Defendant Carroll personally participated in the alleged wrongful

conduct, he is entitled to judgment as a matter of law.

**B.     Defendant Carroll was not deliberately indifferent to Smith's medical needs.**

Although not clearly stated, Smith's Section 1983 claim against Defendant Carroll

appears to be based upon the Eighth Amendment, under which states have a duty to provide

"adequate medical care to those it is punishing by incarceration.  *West v. Keve*, 571 F.2d 158,

161 (3d Cir. 1978).  The Eighth Amendment protects from cruel and unusual punishment and

requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). The Third Circuit has found "deliberate indifference" to a serious medical need in circumstances where the prison official "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; (3) prevents a prisoner from receiving needed or recommended medical treatment; or (4) "persists in a particular course of treatment in the face of resultant pain and risk of permanent injury." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) *citing Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987); *White v. Napoleon*, 897 F.2d 103, 109-11 (3d Cir. 1990). *See also Spruill v. Gillis*, 372 F.3d 218, 235-36 (3d Cir. 2004) (concluding that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirements of deliberate indifference."), *citing Durmer v. Carroll*, 991 F. 2d 64 (3d Cir. 1993). The Third Circuit expressed the important policy reasons for placing legal responsibility for medical decisions on trained medical personnel. *Spruill*, 372 F.3d at 326-27.

Defendant Carroll was not deliberately indifferent to Smith's serious medical needs. The Supreme Court requires Smith to demonstrate that Defendant Carroll acted recklessly by consciously disregarding a substantial risk of harm to establish "deliberate indifference" on the part of that official. *See Farmer v. Brennan*, 511 U.S. 825, 837-40 (1994) (adopting subjective recklessness standard from criminal law as the test for deliberate indifference under the Eighth Amendment). Smith's sole basis for naming Defendant Carroll as a defendant is Defendant Carroll's purported failure to respond to Smith's letters. (Ex. A – Smith Dep. 18:1-24, 19:1-4). As discussed, Smith has failed to produce any copies of the correspondence or any other

evidence that would support this claim. Regardless, a simple act of writing a letter to the Defendant does not establish deliberate indifference. Defendant Carroll is not a physician, and cannot be considered deliberately indifferent merely because he may have failed to respond directly to the medical complaints of a prisoner who was already being treated by prison doctors. *See Durmer,* 991 F.2d at 69.

Smith's real complaint is about the course and/or quality of the medical treatment provided to him. (Complaint, *passim*). Smith and medical personnel clearly disagree on the course of his treatment. Smith believes he needs surgery and medical personnel continue to monitor Smith's scalp and prescribe medication. While Smith has his own opinions regarding the course of treatment, the Constitution does not guarantee a prisoner the treatment of his choice. *Tillery v. Owens,* 719 F .Supp. 1256, 1305 (W.D.Pa. 1989), *citing Jackson v. Fair,* 846 F.2d 811, 817 (1st Cir. 1988). Defendant Carroll relies on the professional judgment and expertise of medical personnel with whom the DOC has contracted.

Smith has an obligation to set forth specific facts through evidence to establish a genuine issue for trial. *Celotex*, 477 U.S. at 322. To date, Smith has not come forth with *any* evidence to support that Defendant Carroll was deliberately indifferent to his medical needs. Thus Defendant Carroll is entitled to judgment as a matter of law.

## II.      Defendant is Immune from Liability for Smith's Claims.

To the extent Smith seeks to hold Defendant Carroll liable in his official, as well as his individual capacity, Defendant Carroll is immune from such claims.

### A.      Defendant Carroll is immune from liability in his official capacities pursuant to the Doctrine of Sovereign Immunity and the Eleventh Amendment.

Defendant Carroll is immune from liability under the Eleventh Amendment in his official capacity. The Eleventh Amendment stands "for the constitutional principle that State sovereign

immunity limit[s] the federal courts' jurisdiction under Article III." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 64 (1996). The United States Congress can waive the state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment, however, only a clear indication of Congress's intent to waive the state's immunity will produce this result. *Id.* No such clear intent can be found in 42 *U.S.C.* § 1983. In fact, Congress's intent appears to be to the contrary as the statute facially allows suits only to be brought against persons. 42 *U.S.C.* § 1983.

A suit against state officials in their official capacities is treated as a suit against the State. *Hafer v. Melo*, 502 U.S. 21 (1991). Under federal law, the Defendant in his official capacity is not a "person" for the purposes of § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Consequently, this Court lacks jurisdiction over the Defendant in his official capacity, and the Defendant is outside the class of persons subject to liability under 42 *U.S.C.* § 1983. Summary judgment is therefore appropriate.

**B.    Defendant Carroll is immune from liability in his individual capacity pursuant to the doctrine of qualified immunity.**

Defendant Carroll is entitled to qualified immunity for any claims against him in his individual capacity. Government officials performing discretionary functions are immune from liability for damages, provided that their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A right is clearly established when, "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Furthermore, Defendant is entitled to qualified immunity where he acted in good faith, without gross or wanton negligence, in the performance of his discretionary duties. *Vick v. Haller*, 512 A.2d 249 (1986).

Because there is no evidence to establish a causal link between any action by the Defendant and a deprivation of Smith's constitutional right, it can not be said that he violated a clearly established right.  Based on the available facts in the record, Defendant is entitled to qualified immunity as he had no involvement with the alleged wrongdoings that form the basis of Smith's Complaint.

Defendant is immune from liability in his official and individual capacities. Smith cannot maintain this action against Defendant Carroll.  Summary judgment should be awarded in favor of Defendant Carroll.

## CONCLUSION

For the herein stated reasons, Defendant Thomas Carroll respectfully requests that this Honorable Court grant his Motion for Summary Judgment and dismiss Smith's claims against him with prejudice.

**DEPARTMENT OF JUSTICE**
**STATE OF DELAWARE**

*/s/ Stacey X. Stewart*
Stacey X. Stewart ID.: 4667
Deputy Attorney General
Department of Justice
820 N. French Street, 6th Floor
Wilmington, DE  19801
(302) 577-8400
stacey.stewart@state.de.us
*Attorney for Defendant*

Dated: September 2, 2008

## *CERTIFICATE OF SERVICE*

I hereby certify that on September 2, 2008, I electronically filed *Defendant Thomas Carroll's Memorandum of Points and Authorities in Support of his Motion for Summary Judgment* with the Clerk of Court using CM/ECF. I hereby certify that on September 2, 2008, I have sent notification of such filing by U.S. First Class Mail to:

Kenneth Smith, Inmate
SBI#193906
James T. Vaughn Correctional Center
1181 Paddock Road
Smyrna, DE  19977

*/s/ Stacey X. Stewart*
Stacey X. Stewart ID.: 4667
Deputy Attorney General
Department of Justice
Carvel State Bldg., 6th Fl.,
820 N. French Street
Wilmington, DE  19801
stacey.stewart@state.de.us

# EXHIBIT A

# In The Matter Of:

*Kenneth Smith v.*
*Stan Taylor*

---

*Kenneth Smith*
*July 25, 2008*

---



230 North Market Street • Wilmington, DE 19801 • phone 302.571. 0510 • fax 302.571.1321
15 East North Street • Dover, DE 19901 • phone 302.734.3534 • fax 302.734.3552
Corbett & Wilcox is not affiliated with Wilcox & Fetzer, Court Reporters

*Original File Smith_Kenneth - Vol. I.txt*
***Min-U-Script®***

**Kenneth Smith**

18

1         Q.    Okay.  Who is Tom Carroll?

2         A.    Who is he?

3         Q.    Yes.

4         A.    I guess he's the warden.  I don't really -- I

5  don't know who they are really as far as their titles.

6         Q.    You don't know what his title is?

7         A.    No.  Not offhand.

8         Q.    Okay.  Have you ever met him?

9         A.    No.  Not personally.

10        Q.    So I take it, then, you don't know what he

11  looks like.

12        A.    No.

13        Q.    Okay.  Do you know why he was named as a

14  defendant in the lawsuit?

15        A.    Why I wrote -- well, I have people like write

16  letters for me when I need things done.  And I guess he

17  wrote some letters -- letters wrote to them, the warden,

18  or whoever Stan Taylor is and whoever Tom Carroll --

19  whichever one they are.  So I guess that's why I didn't

20  put it in the what-you-call-them, because I didn't have

21  any response back from them.

22        Q.    Okay.  So the basis for your allegations

23  against Stan Taylor and Tom Carroll were letters were

24  written on your behalf of them to them and you didn't

**Kenneth Smith**

19

1    receive a response?

2        A.    Yes.

3        Q.    Any other reasons?

4        A.    No, no.

5        Q.    And can you tell me when these letters were

6    written?

7        A.    I don't have a recollection, because it's been

8    over a period of almost ten years since I complained.  I

9    don't have no like recollection of months or dates.  I

10   didn't write nothing down, so...

11       Q.    You can't tell me any date that you wrote

12   letters to either of these individuals?

13       A.    No, ma'am.

14       Q.    Can you tell me what was in the letters?

15       A.    I can't tell you exactly what was in the

16   letters, but it was basically trying to get some help for

17   my head, asking them that I had been writing the medical

18   complaining about the situation they haven't been, you

19   know, taking serious.  You know, I'm just trying to get

20   somebody to help so I can get something done about my

21   head.  So that's the only time.  That's what it was

22   related to -- to get something about my head to try to

23   get some help.

24       Q.    Are you able to get me any copies of any of

**Kenneth Smith**

24

1    to you for copies of your grievances.  Okay?

2        A.    I see it now.

3        Q.    Okay.  So do you have some of those that you

4    can send to me?

5        A.    Yes.  I can send you copies of what I got.

6        Q.    Okay.  Stan Taylor, is he named in the lawsuit

7    for the same reasons that Tom Carroll was named?

8        A.    I guess.  I don't -- I guess.

9        Q.    Do you know who Stan Taylor is?

10       A.    I haven't met any of them --

11       Q.    Okay.

12       A.    -- Stan Taylor or the warden -- personally.

13   So I don't know them personally.

14       Q.    Why did you name Stan Taylor in the lawsuit?

15       A.    I guess because I'm saying he -- I couldn't

16   really tell you.  The person who's helping me with the

17   lawsuit, they knew more about lawsuits than I do as far

18   as doing paperwork.  So they're helping me.  I just told

19   them my situation.  I had a problem.  And it ain't

20   getting addressed.  And I just wanted the problem

21   addressed.  So they said they could help me -- try to

22   help me get the problem addressed.  So they helped me

23   with the lawsuit.  I put the suit in to try to get me the

24   proper help.

**Kenneth Smith**

27

1       A.    Plus they had to stitch my -- I had to have

2    surgery on my lip.

3       Q.    Okay.  And what injuries did you have when you

4    got hit by the car?

5       A.    Ligaments ripped.

6       Q.    So that's something that just had to heal on

7    its own?

8       A.    Huh?

9       Q.    Is that something that doctors said just had

10    to heal on its own?

11       A.    What:  The ligaments.

12       Q.    Yeah.

13       A.    No.  I had an operation.

14       Q.    They operated on you?

15       A.    Yeah.

16       Q.    Other than those two things, can you remember

17    any other injuries that you had?

18       A.    I can't remember nothing.

19       Q.    Okay.  Tell me when the problem began with

20    your head.

21       A.    When I got down here -- I don't know if it

22    came from clippers.  But I know it was -- I had a scratch

23    on the top of my head.  And I had -- it was hurting me

24    and it kept bleeding.  So I went to put a medical slip

**Kenneth Smith**

28

1    in.  And they checked it out.  They told me it was just a

2    hair bump, a little hair bump.  So they prescribed me

3    some -- I think it was a surface shampoo.  Some kind of

4    orange shampoo to wash your hair with.  And Amoxicillin

5    pills.  They told me to take them.  And that was it.  And

6    from then on it just kept getting worse and worser.  And

7    I put another slip in and tell them it -- they still told

8    me it's a hair bump -- until it got to the point what it

9    is now over the years.

10        Q.   Did you have the cut before or after you got

11   to prison?

12        A.   I think when I got here.  When I got here to

13   prison, I think.

14        Q.   Do you think when you came in you had like a

15   small abrasion?  Or did it happen afterwards?

16        A.   I think it happened when I was getting my

17   haircut or something.  I don't know if it was when I was

18   getting my haircut.  It was over almost ten years, so...

19        Q.   Are you not entirely sure when it happened?

20        A.   I know it happened here.  When I was here.

21        Q.   Okay.

22        A.   It happened when I was here.

23        Q.   And it started off as a small cut?

24        A.   Just a little scratch or something.  And they

**Kenneth Smith**

29

1    said it was a hair bump.  They said, oh, it's just a

2    little hair bump.  And they gave me -- prescribed me the

3    shampoo and some Amoxicillin pills or something.

4        Q.    Just give me one sec.

5        A.    Mm-hmm.

6        Q.    Do you remember when you came in when you did

7    your intake when you were incarcerated if you had any

8    rash or problems that they noted?

9        A.    Not -- I'm not sure.  I can't remember

10   exactly, you know, what they put down when I got to

11   intake here.  But I know they usually take pictures of

12   you if you got tattoos.  I think they ask you you got any

13   scars or anything on you.  So if I had the situation with

14   my head, I knew they would -- like it is, they would have

15   took -- they would have put that down.  That is something

16   that can be identified, so...

17       Q.    Okay.  So when you came in and you had it,

18   they probably would have made note of it --

19       A.    Yeah.

20       Q.    -- if you had anything.

21       A.    They would have made note of this.

22       Q.    You think even if it was just like a scratch

23   they would have made note of it?

24       A.    No.  They wouldn't.  Probably not.  They

**Kenneth Smith**

32

1    saying, to my knowledge, the hair bump -- the way the

2    doctors explain it is a hair bump is not a disease.  It's

3    just a hair.  Like when you shave.

4         Q.   Right.

5         A.   Instead of your hair growing out, it just

6    curls up.

7         Q.   Right.

8         A.   They said really it's not even a skin disease.

9    There's no treatment for it, because it's just your hair.

10   Instead of growing out, it grows in and makes a bump.

11   And that's what they did.  They -- I guess they try to

12   say, you know, it was a matter with my head up top.  It

13   was a hair bump, which it was not.

14        Q.   How is it right now?  Is it bothering you?

15        A.   Yes.  It bleeds.

16        Q.   Okay.  When was the last time you saw --

17        A.   (The witness indicated.)

18        Q.   -- medical personnel?

19        A.   I try to never go see them.  Last time I seen

20   them was Monday.  That was for blood pressure.  I

21   don't --

22        Q.   I guess I just mean for your head.  I should

23   have been more specific.

24        A.   I don't go see them.  I don't even want to see

**Kenneth Smith**

33

1    them for my head.  They the reason why it's like this

2    now, so...

3         Q.   So I'm trying to understand, because you filed

4    a suit because you want treatment.  But now you're saying

5    you don't even want them to see you.

6         A.   I mean, my thing is:  I'm been seeing them for

7    over a period of ten years.  And my head is like this.

8         Q.   So what is it that you want?

9         A.   They took me to see a dermatologist like a few

10   occasions.  They took me like, I think, three times.  And

11   every time they had injected me.  They said they was

12   going to try to inject me with some kind of steroids or

13   something.  They said that they let it get too far gone.

14   If they had brought me in earlier, the medicine probably

15   would have had more effect.  But they wanted to see how

16   that would take with whatever situation it would be with

17   the shots and for me to come back three to six weeks for

18   the follow-up.  But that each time I was never took back

19   for the follow-up, so...

20        Q.   When was the last time you went to a

21   dermatologist?

22        A.   I think it was in 2006.

23        Q.   Okay.  And have there been appointments made

24   for you here for your head and you just don't go?

**Kenneth Smith**

34

1      A.    No.   They never call me up here for my -- they

2   made no appointments for me to come see them about my

3   head.

4      Q.    So there's no appointment that you never

5   didn't show up for?

6      A.    No.   I always showed up for my appointments on

7   my head.  I put the slip in.  The only reason I get an

8   appointment is if I put it in.  I have to submit a slip

9   to be seen --

10     Q.    So --

11     A.    -- for a certain problem.

12     Q.    I'm sorry.

13     A.    That's all right.

14     Q.    Does it hurt?  Is it painful at all?

15     A.    Yeah.  It bothers.  It's irritating.  It

16  bothers me.  It bleeds a lot.  It's sore.

17     Q.    Does it bleed just for no reason or when it

18  gets scratched or cut with clippers or something?

19     A.    If I'm washing my head -- take a rag over my

20  head, it bleeds.

21     Q.    Okay.

22     A.    From laying on my pillow.  I wake up and

23  there's blood spots.

24     Q.    Has it gotten any better --

**Kenneth Smith**

42

1          A.    And for follow-up.  So they didn't really -- I

2    can't recollect.  But...

3          Q.    Did you ever refill any of these prescriptions

4    that the dermatologist gave you at the institution?

5          A.    I don't think I had no refills.  I don't

6    think.

7          Q.    Okay.  They just gave you one?

8          A.    Yeah.

9          Q.    Did any doctor ever tell you that surgery was

10   required for your head?

11         A.    I don't think they said it was like required,

12   but my thing -- I think I was asking them:  How can I get

13   the problem tooken care of?

14         Q.    Right.

15         A.    You know, because this thing be sore.  And I

16   was asking them was the shots -- you know, is it going to

17   clear it up?  And they was telling me the shots wouldn't

18   clear it up.  They might help some, but it's not going to

19   clear it up.  And I probably would need surgery.  So

20   that's when surgery came up.  They said that would

21   probably be the only option of getting it cleared.  But

22   they said the institution, I guess, put in for the -- I

23   guess, to give me shots or whatever.  I don't know.

24         Q.    Okay.  Did you ever get any shots here and not

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KENNETH SMITH,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )    C.A. No. 07-269-SLR
                                        )
STAN TAYLOR, THOMAS CARROLL,            )    JURY TRIAL DEMANDED
FIRST CORRECTIONAL MEDICAL,             )
INC., DAVID WILKERSON, and              )
GAIL ELLER,                             )
                                        )
            Defendants.                 )

### PLAINTIFF'S RESPONSE TO DEFENDANT CARROLL'S PRODUCTION REQUEST

**REQUEST NO. 1:**  Plaintiff does not have copies of all the grievances filed, same can be secured from department of corrections.

**RESPONSE NO.2:**  Do not have copies of correspondences arising out of the allegations.

**RESPONSE NO. 3:**  None available.

**RESPONSE NO.4:**  Medical records can be secured from Correctional Medical Services, inmated not provided copies of same.

**RESPONSE NO. 5:**  Copy of criminal records in possession of the department of corrections

**REQUEST NO.6:**  Medical records can be secure from Correctional Medical Services.

**REQUEST NO. 7:**  None available.

KENNETH SMITH, 193906

DATED:  May 14, 2008

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** a copy of the aformention was furnished

Stacey x. Stewart, Esquire, Department of Justice, Carvel State

Office Building, 820 N. French Street, Wilm, DE  19801.

By United States Mail this 14th day of May 2008, with sufficient

postage affixed thereto.

KENNETH SMITH, 193906

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)

Page 1

C
Murphy v. Kearney
D.Del.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Jon R. MURPHY, Plaintiff,
v.
Rick KEARNEY, Susan Rickards, Barbara Show-
ell, and Correctional Medical Services, Defendants.
**No. Civ.03-554-SLR.**

April 19, 2004.

Jon R. Murphy, Eastern Correctional Institution,
Westover, Maryland, Plaintiff pro se.
Stuart B. Drowos, Deputy Attorney General, State
of Delaware Department of Justice, Wilmington,
Delaware, for Rick Kearney.
Steven F. Mones, McCullough & McKenty, P.A.,
Wilmington, Delaware, for Susan Rickards and
Barbra Showell.
Kevin J. Connors, Marshall, Dennehy, Warner,
Coleman & Goggin, Wilmington, Delaware, for
Correctional Medical Services.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On June 10, 2003, Jon R. Murphy, a *prose*
plaintiff proceeding in *formapauperis,* filed the
present action pursuant to 42 U.S.C. § 1983, against
defendants Rick Kearney, Susan Rickards, Barbara
Showell, and Correctional Medical Services
("CMS"), alleging claims predicated upon inad-
equate medical treatment. (D.I. 1, 2 at 3). When
plaintiff filed his complaint, he was a Delaware
prison inmate incarcerated at the Sussex Correc-
tional Institute ("S.C.I.") in Georgetown, Delaware.
(D.I.2) Currently, plaintiff is being held at the East-
ern Correctional Institution in Westover, Maryland.
(D.I.28) Plaintiff seeks damages in the amount of

$350,000. (D.I. 2 at 4) The court has jurisdiction
over the instant suit pursuant to 28 U.S.C. § 1331.

On August 18, 2003, plaintiff submitted a motion to
set aside/stay proceedings. (D.I.11) The court re-
sponded to plaintiff's motion on August 19, 2003,
with a notice of deficiency stating that plaintiff had
failed to provide an original signature on the mo-
tion, and the motion was improperly captioned for
two separate cases. (D.I.12) In addition, plaintiff
failed to provide proof of service upon defendants.
(*Id.*) On August 27, 2003, the court received anoth-
er motion to set aside/stay proceedings with an ori-
ginal signature and certificate of service. (D.I.11)
On October 2, 2003, defendant CMS submitted a
motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)
for failure to state a claim upon which relief can be
granted. (D.I.19) The court granted plaintiff's mo-
tion to set aside/stay proceedings for a period of
ninety (90) days on October 6, 2003. (D.I.21) The
court also ordered plaintiff to notify the court in
writing within ninety (90) days of whether he had
exhausted his administrative remedies. (*Id.*) On Oc-
tober 7, 2003, defendants Susan Rickards and Bar-
bara Showell filed a motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6) for failure to state a claim
upon which relief can be granted. (D.I.22) On Octo-
ber 14, 2003, attorney Steven Mones filed an affi-
davit in connection with defendants' motion to dis-
miss, which was included as exhibit six. (D .I. 24)
Defendant Kearney filed a motion to dismiss on
December 19, 2003. (D.I.25, 26) On January 5,
2004, the court sent a letter of rejection to plaintiff
for failure to provide proof of service on all local
counsel of record regarding plaintiff's notice of
status. (D.I.27) Plaintiff requested a notification of
status and an extension/continuance to set aside/
stay proceedings in order to pursue his remedies in
the lower court on February 6, 2004. (D.I.29) On
February 12, 2004, the court denied plaintiff's
status report and ordered plaintiff to respond to all
pending motions to dismiss by March 26, 2004.
(D.I.30) The court also ordered defendants to file

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)

reply briefs by April 4, 2004. (*Id.*) Finally, on February 27, 2003, plaintiff filed an untimely response to defendants' motions to dismiss. (D.I.31) For the reasons that follow, the court grants defendants' motions to dismiss.

## II. BACKGROUND

**\*2** While incarcerated in S.C.I., plaintiff alleges that he suffered from a herniated disk in his back. (D.I. 2 at 3) On May 24, 2003, plaintiff submitted a medical grievance stating: "I have been to medical (six) times. I am getting the 'runaround[.]' I am no longer in the key program. I have a herniated disk in my spine."(D.I.2) Plaintiff claims the problem existed before his incarceration and grew worse during the term of his incarceration.(*Id.*) Plaintiff also describes his pain as severe. (*Id.*) He asserts that he requested a bottom bunk on the bottom floor, but that his requests have been denied. (*Id.*) In addition, plaintiff contends that he has been x-rayed and that these x-rays confirm his condition. (*Id.*) Plaintiff further states that he has complained about his herniated disk to the medical department, but the medical department told him that nothing was wrong. (D.I. 2 at 3)

## III. STANDARD OF REVIEW

Because the parties have referred to matters outside the pleadings, defendants' motions to dismiss shall be treated as motions for summary judgment. *See*Fed.R.Civ.P. 12(b)(6). A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986)."Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence

exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."*Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

A. Defendants' Motions to Dismiss For Failure to Exhaust Administrative Remedies

**\*3** Defendants Kearney, Showell, and Rickard argue that plaintiff did not exhaust his administrative remedies prior to filing this action. (D.I. 22 at ¶ 10; D.I. 26 at ¶ 5) Under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, "no action shall be brought with respect to prison conditions under § 1983 of this title ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."A plaintiff-inmate, therefore, must exhaust his administrative remedies before filing a civil action, even if the ultimate relief sought is not available through the administrative process. *See*Booth

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)

*v. Churner*, 206 F.3d 289, 300 (3d Cir.2000); *seealsoAhmed v. Sromovski*, 103 F.Supp.2d 838, 843 (E.D.Pa.2000) (quoting *Nyhuis v. Reno*, 204 F .3d 65, 73 (3d Cir.2000)). In order for § 1997e to apply, however, two requirements must be met. First, a prisoner's complaint must concern prison conditions. Prison conditions are defined as conditions with respect to the conditions of the confinement. *See*18 U.S.C. § 3626(g)(2). The Third Circuit has interpreted this language to relate "to the environment in which prisoners live, the physical conditions of that environment, and the nature of the services provided therein."*Booth,* 206 F.3d at 294.

Second, the department of correction must have an administrative procedure in place to remedy prisoner complaints. The State of Delaware has an established and comprehensive Inmate Grievance Review System. The Inmate Grievance Procedure states that "[e]very inmate will be provided a timely, effective means of having issues brought to the attention of those who can offer administrative remedies before court petitions can be filed."State of Delaware Department of Correction Procedure Manual, Procedure Number 4.4, § II (revised May 15, 1998). The procedure creates a three-step grievance process with two levels of appeal. *Id.* at § V. To exhaust all available administrative remedies, a prisoner must complete all stages of review or take part in the appeals process. The procedure also provides for medical grievances.

Delaware Department of Correction administrative procedures provide that

medical grievances be submitted to the [Inmate Grievance Chair], who will forward the grievance to the medical service contractual staff for review. The medical services contractual staff will attempt informal resolution of the matter. If such resolution fails, a Medical Grievance Committee ("MGC") hearing will be conducted, which hearing will be attended by the grievant and the [Inmate Grievance Chair]. If the matter is resolved at that stage, the case is closed; otherwise, the grievant is directed to complete the MGC Appeal Statement section of the

written grievance and forward it to the [Inmate Grievance Chair].

*Smullen v. Kearney,* Civ.A.No.02-082-SLR, 2003 WL 21383727, *2 (D.Del.2003) (quoting Department of Correction Policy 4.4).

*4 In the case at bar, plaintiff submitted a medical grievance on May 24, 2003 complaining of a herniated disk in his back. (D.I.2) On June 6, 2003, defendant Showell responded to plaintiff's grievance in accordance with procedures outlined for medical grievances, stating: "Your x-ray showed no herniation (hernias can repair). You refused medication and you do not meet the bottom floor or bunk criteria. Return to sick cell if you have continued or worsened symptoms."(*Id.*) There is no evidence of record to determine whether plaintiff pursued his grievance before the Medical Grievance Committee or whether he completed an appeal. There is likewise no evidence showing that plaintiff filed additional grievances concerning his back condition. Due to the lack of evidence of record to support a finding that plaintiff exhausted his administrative remedies, the court finds that plaintiff failed to exhaust his administrative remedies and grants defendants' motions to dismiss based on this ground.

B. Defendants' Motions to Dismiss on Respondeat Superior Liability Grounds

Assuming that plaintiff exhausted his administrative remedies, the court shall consider the substance of the motions at bar. CMS contends that it is not liable for the actions of its alleged employees under the doctrine respondeat superior. (D.I. 19 at ¶ 7) Kearney likewise argues that he is being sued in his capacity as the prison warden and that the doctrine of respondeat superior may not be used. (D.I. 26 at ¶ 7) Rickards contends that she had no personal involvement in plaintiff's medical care and was merely acting in a supervisory capacity. (D.I. 22 at ¶ 16; *Id.* at ex. 10)

The Third Circuit has held that "[a] defendant in a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)

Page 4

civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior."*Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988); *Monell v. Dep't. of Social Servs.,* 436 U.S. 658 (1978); *seeSwan v. Daniels,* 923 F.Supp. 626, 633 (D.Del.1995) (applying principle to liability of private corporations that provide medical services for the State of Delaware). Personal involvement can be established through allegations of either personal direction or actual knowledge and acquiescence; however, such allegations must be made with particularity. *SeeRode,* 845 F.2d at 1207.

Viewing the facts in a light most favorable to plaintiff, the court finds that plaintiff has not provided sufficient evidence to show that CMS, Kearney, or Rickard had any personal involvement with his medical treatment. Plaintiff only mentioned these defendants in the caption of his complaint and in the space provided for defendants on the third page of his complaint. (D.I.2) Plaintiff did not cite to any specific incidents where CMS, Kearney, or Rickard personally participated in his treatment or diagnosis. The court, therefore, concludes that plaintiff has failed to state a claim upon which relief can be granted.

## C. Defendants' Motions to Dismiss on *Estelle* Grounds.

**\*5** Defendants allege they did not violate plaintiff's Eighth Amendment rights by providing inadequate medical treatment. To state a violation of the Eighth Amendment right to adequate medical care, plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."*Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *White v. Napoleon,* 897 F.2d 103, 109 (3d Cir.1990). Deliberate indifference is demonstrated when "prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such

*Monmouth County Corral. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987). In addition, either actual intent or recklessness will afford an adequate basis to show deliberate indifference. *Estelle,* 429 U.S. at 105.

A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."*Pace v. Fauver,* 479 F.Supp. 456, 458 (D.N .J.1979). A prison official may be found to have violated an inmate's Eighth Amendment rights only if the official knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *SeeFarmer v. Brennan,* 511 U.S. 825, 837 (1994).

Moreover, mere medical malpractice is insufficient to present a constitutional violation. *Estelle,* 429 U.S. at 106;*Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993). Prison authorities are given extensive liberty in the treatment of prisoners. *SeeInmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.1979); *seealsoWhite v. Napoleon,* 897 F.2d 103, 110 (3d Cir.1990) ("Certainly no claim is stated when a doctor disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness."). The proper forum for a medical malpractice claim is in state court under the applicable tort law. *Estelle,* 429 U.S. at 107.

The court finds that plaintiff is unable to satisfy the *Estelle* test. Plaintiff has not provided sufficient evidence to show that he had a serious medical condition. In his response to the instant motions, plaintiff provided a medical report dating June 19, 1991, stating "the MRI shows a herniated nucleus pulposus to the left at C5-6."(D.I.31) However, this report is dated twelve years prior to the more recent x-ray report which was evaluated on June 6, 2003 by Showell. (D.I.2) The latest x-ray report showed no signs of a herniated disk in plaintiff's back. (*Id.*)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)

Plaintiff also stated that he saw a doctor a week prior to February 6, 2004, but failed to provide any report from the doctor verifying that plaintiff had a herniated disk that required medical attention. (D.I. 31 at ex. C) The court, therefore, finds that plaintiff fails to meet the "serious need" requirement to state a claim for inadequate medical care.

**\*6** The court also finds that plaintiff has failed to allege facts sufficient to show that defendants were deliberately indifferent. CMS, Kearney, and Rickards were not personally involved with plaintiff's treatment, as mentioned above. (D.I. 19 at ¶ 7, D.I. 26 at ¶ 7, D.I. 22 at ¶ 16; *Id.* at ex. 10) These defendants, consequently, could not have acted with deliberate indifference with respect to plaintiff's medical condition. Although Showell did provide medical care to plaintiff, there has been no evidence presented to show that she knew of and disregarded the risk to plaintiff's health posed by his alleged herniated disk. Showell examined plaintiff's x-ray and did not find any indication of a herniated disk. (D.I.2) Showell did not provide any medication to plaintiff because plaintiff refused all medication. (D.I. 22 at ex. 8) She advised plaintiff, however, that he did not meet the criteria for a bottom bunk on the bottom level and told him to return to the sick cell if the pain continued or the symptoms worsened. (D.I.2) Therefore, the court grants Kearney's, Rickards's, Showell's, and CMS's motions to dismiss for inadequate medical care.

V. CONCLUSION

For the reasons stated, defendants' motions to dismiss for failure to state a claim are granted. (D.I.19, 22, 25) An appropriate order shall issue.

D.Del.,2004.
Murphy v. Kearney
Not Reported in F.Supp.2d, 2004 WL 878467 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)

Page 1

C
Gregory v. PHS Inc.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
William GREGORY, Plaintiff,
v.
PHS INC., Mr. Fish, (Dir.MPCJF), Dr. Ivens,
(Med.Dir.), Stanley Taylor (Comm.Doc), and
Warden Williams (MPCJF), et al, Defendants.
No. Civ.A. 00-467-SLR.

Sept. 21, 2001.

William Gregory, MPCJF, Wilmington Delaware.
pro se.
Seth J. Reidenberg, Esquire, White and Williams,
Wilmington, Delaware, for Defendants PHS Inc.,
Mr. Fish and Dr. Ivens.
Ophelia M. Waters, Deputy Attorney General, State
of Delaware Department of Justice, Wilmington,
Delaware, for Defendants Taylor and Williams.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On May 8, 2000, *prose* plaintiff William
Gregory filed a civil rights action pursuant to 42
U.S.C. § 1983, asserting that defendants PHS, Inc.,
Mr. Fish, Dr. Ivens, Stanley Taylor, and Warden
Williams [FN1] violated his constitutional rights by:
(1) failing to properly treat a cut on his elbow
caused by the teeth of another inmate; and (2) fail-
ing to administer an HIV test. (D.I.2) Plaintiff seeks
to hold defendants responsible for any future med-
ical problems, mental anguish he has suffered and
to compel them to administer the "proper blood
work." (*Id.*)

> FN1. According to plaintiff, PHS, Inc. is
> the company contracted to provide medical

services to inmates, Mr. Fish is the Direct-
or of the Multi-Purpose Criminal Justice
Facility ("M.P.C.J.F."), Dr. Ivens is Med-
ical Director, Stanley Taylor is the Com-
missioner of the Department of Correction
and Warden Williams is the Warden of
M.P.C.J.F. (D.I.2).

On December 15, 2000, defendants PHS, Inc.,
Ivens and Fish ("medical defendants") filed a mo-
tion to dismiss plaintiff's complaint, arguing: (1)
plaintiff failed to exhaust his administrative remed-
ies pursuant to 42 U.S.C. § 1997e(a); (2) his allega-
tions do not rise to a constitutional level; and (3)
plaintiff has failed to demonstrate any personal in-
volvement by defendants. (D .I. 14) On December
18, 2000, plaintiff filed a motion for the appoint-
ment of counsel. (D.I.15) Defendants Taylor and
Williams ("state defendants") moved to dismiss on
December 27, 2000, asserting: (1) plaintiff did not
exhaust his administrative remedies: and (2) under
Fed.R.Civ.P. 12(b)(6), plaintiff has failed to state a
claim upon which relief can be granted. (D.I.16)
Plaintiff has not filed opposition to either motion.
For the reasons discussed below, medical defend-
ants' motion to dismiss is granted, state defendants'
motion is granted, and plaintiff's motion for ap-
pointment of counsel is denied.

II. FACTS

According to plaintiff, while in the yard he was cut
on the elbow by the tooth of another inmate. (D.I.2)
He was taken to the medical ward where a nurse
washed the wound and then applied steri-strips to
close the cut. Although HIV is "rampant in the sys-
tem," plaintiff was not given an HIV test. (*Id.* at 3)
He further complains of not receiving stitches even
though the nurses recommended them. Plaintiff in-
dicates he filed a grievance pursuant to the prisoner
grievance system, but never received an HIV test
and his "cut wasn't treated to as they promised."(*Id.*
at 2)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)

Page 2

## III. STANDARD OF REVIEW

Since medical and state defendants have referred to matters outside the pleadings, their motions shall be treated as ones for summary judgment. *See*Fed.R.Civ.P. 12(b)(6); *Camp v. Brennan,* 219 F.3d 279, 280 (3d Cir.2000) (consideration of matters beyond the complaint converts a motion to dismiss into a motion for summary judgment). A party is entitled to summary judgment only when the court concludes "that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no material issue of fact is in dispute. *SeeMatsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assur. Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *SeeCelotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The mere existence of some evidence in support of the party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *SeeAnderson nonmoving v. Liberty Lobby, Inc.* 477 U.S. 242, 249 (1986). This court, however, must "view all the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995);Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

**\*2** Medical and state defendants contend plaintiff did not exhaust his administrative remedies prior to filing this action pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and accordingly, his complaint must be dismissed. (D.I. 14 & 16) The Prison Litigation Reform Act provides that

[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted.

(Amended by Pub.L. 104-134.Title I, § 101(a), 110 Stat, 1321-71(1996)). Before filing "a civil action with respect to prison conditions,"[FN2] a a plaintiff-inmate must exhaust his administrative remedies, even if the ultimate relief sought is not available through the administrative process. *Booth v. Churner,* 206 F.3d 289, 294-95 (3d Cir.2000), *aff'd,*531 U.S.956, 121 S.Ct. 1819 (2001). The United States Supreme Court has concluded that exhaustion of administrative remedies is required "as long as [the] grievance tribunal has the authority to take some action in response to the inmate's complaint."*Booth v. Churner,* 531 U.S. at ___, 121 S.Ct. at 1821.

> FN2. The term "civil action with respect to prison conditions" means any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison. 18 U.S.C. § 3626(g)(2).

Although the Supreme Court has specifically mandated exhaustion prior to commencement of a civil

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)

Page 3

rights action, the Court has been silent on whether the plaintiff must affirmatively demonstrate exhaustion at the time of instituting the action or whether the defendant must raise the issue as an affirmative defense. The PLRA itself does not specifically state which party bears the burden. *Freeman v. Snyder,* Civ.A.No. 98-636-GMS, 2001 WL 515258 (D.Del. April 10, 2001).

While other circuits have ruled on this issue, the Third Circuit [FN3] has not yet articulated whether the PLRA exhaustion requirement is an affirmative defense or a condition precedent to filing. *Ahmed v. Sromovski,* 103 F.Supp.2d 838, 842 n. 13(E.D. Pa 2000). The Third Circuit has determined, however, that the PLRA's exhaustion requirement is not jurisdictional.*Nyhuis v. Reno.* 204 F.3d 65, 69 n. 4 (3d Cir.2000). And "[c]ompliance with the administrative remedy scheme will be satisfactory if it is substantial."*Id.* at 77-78.

> FN3. Specifically, the Sixth Circuit has interpreted the PLRA with a condition precedent, whereby the prisoner must allege and show he has exhausted all administrative remedies prior to bringing suit. *Brown v. Toombs,* 139 F.3d 1102, 1103-04 (6th Cir.1998), *cert.denied*525 U.S. 833 (1998). Accordingly, a prisoner must submit, along with his § 1983 complaint, the administrative decision, if it is available, showing the administrative disposition of his claims or specifically detail the administrative proceeding and its outcome. *Knuckles El v. Toombs,* 215 F.3d 640, 642 (6th Cir.2000), *certdenied*531 U.S. 1040 (2000). District courts in the Sixth Circuit are directed to enforce the exhaustion requirement *suasponte* if not raised by the defendant. *Brown.* 139 F.3d at 1104;*Curry v. Scott,* 249 F.3d 493, 502 (6th Cir.2001).

> In contrast, the Seventh Circuit has concluded that Section 1997e(a) creates an affirmative defense. *Perez v. Wisconsin Department of Corrections.* 182 F.3d

532 (7th Cir.1999); *Massey Helman,* 196 F.3d 727 (7th Cir.1999), *cert.denied*__ U.S. __, 121 S.Ct 2214 (2001). Following the path created by the Seventh Circuit, other courts have imposed the affirmative defense on defendants when there is silence in their circuits.*Jackson v. District of Columbia,* 89 F.Supp.2d at 56;*Freeman v.. Snyder,* 2001 WL 515258 at *5 (the court holds that prisoner's failure to exhaust administrative remedies before filing a claim constitutes an affirmative defense under Rule 8(c) of the Federal Rules of Civil Procedure, rather than a precondition to suit.) *Compare Ahmed v. Sromovski,* 103 F.Supp.2d 83 (E.D. Pa 2000) (notes that the Third Circuit has not defined whether it is a defense or a condition precedent, but does not reach the issue). This court finds the reasoning of the Seventh Circuit persuasive. Moreover, considering the Third Circuit's conclusion that failure to exhaust does not deprive a federal court of subject matter jurisdiction, *Nyhuis v. Reno,* 204 F.3d at 69, supports the conclusion that exhaustion under § 1997e(a) is an affirmative defense. *AccordFreeman v. Snyder,* 2001 WL 515258 at *5.

In *Bowers v. Mounet,* Civ.A.No. 99-533-JJF, the court was faced with an issue similar to that presented at bar. There, plaintiff claimed to have filed a grievance regarding his medical complaints, but he did not receive anything in response. *Id.* at *2. Neither plaintiff nor defendants attached plaintiff's grievance nor were any documents submitted regarding the grievance. Nonetheless, the court did not dismiss plaintiff's complaint for failure to exhaust administrative remedies because

it [was] clear from Plaintiff's Original Complaint that Plaintiff filed his grievance on or prior June 21, 1999. (D.I.2) This means that the grievance was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)

Page 4

filed almost two years before Defendant Marvel re-filed the instant motion, and that prison authorities have not responded. Although the relevant grievance procedures have not been included as part of the record in this case, it is safe to assume that such a lengthy delay in handling Plaintiff's grievance exceeded the amount of time allowed for prison authorities to respond under said grievance procedure.

*3 *Id.* at *2.

Although there is no record evidence of such, the medical defendants at bar concede that plaintiff filed a grievance.[FN4]Plaintiff's complaint was filed on May 8, 2000. Medical defendants moved to dismiss on December 14, 2000 (D.I.13), and state defendants moved for dismissal on December 27, 2000. (D.I.16) There has been nothing introduced to the court subsequently to indicate a response by medical or prison officials. Considering the grievance procedure mandates prompt resolution of claims (D.I. 14, Ex. B, A-3 ¶ 4; A-4 ¶ 10,A-5, A-6), it is reasonable to conclude that the time afforded to respond has expired.

> FN4. According to the affidavit of a Department of Correction secretary, plaintiff "did not file a medical grievance stating he wanted to make an appointment with the doctor for additional medical treatment."(D.I.16) This secretary does not aver to be a grievance officer or to possess any of the responsibilities of a grievance officer, nor does she claim to have searched for records for any grievance filed by plaintiff. Although she is a senior secretary, she does not claim to be charged with logging or maintaining grievance logs. Further, she is not a member of the medical staff who would see a grievance after being documented by the grievance chairperson, nor is she a member of the grievance committee, which should have held a hearing if efforts to resolve the problem informally failed. Consequently, the affidavit does not adequately establish that plaintiff

failed to follow the grievance procedure.

Consistent with *Bowers,* the court shall not dismiss for failure to exhaust administrative remedies and instead will turn to the substantive issues. *Cf.Chapman v. Brewington-Carr,* C.A.No. 97-271-JJF, slip op. at 3-6 (D.Del. May 1, 2001) (court held dismissal for failure to exhaust inappropriate where prison authorities completely ignored prisoner's grievance).

B. Eighth Amendment: Medical Care

Plaintiff's assertions of inadequate medical care invoke the Eighth Amendment. Under the Eighth Amendment, the States have a duty to provide "adequate medical care to those it is punishing by incarceration."*West v. Keye,* 571 F.2d 158, 161(3d Cir.1978). To hold a prison official liable for violating a prisoner-plaintiff's Eighth Amendments rights, the plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."*Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *accord White v. Napoleon,* 897 F.2d 103, 109 (3rd Cir.1987).

The seriousness of a medical need may be demonstrated by showing that the need is " 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." ' *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir.1987) (quoting Pace v. Fauver, 479 F.Supp. 456, 458 (D.N.J.1979)). Moreover, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." *Id.*

As to the second requirement, a prison official's denial of an inmate's reasonable requests for medical treatment constitutes deliberate indifference if such denial subjects the inmate to undue suffering or a threat of tangible residual injury. *See id.* at 346.Deliberate indifference may also be present if

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)

necessary medical treatment is delayed for non-medical reasons, or if a prison official bars access to a physician capable of evaluating a prisoner's need for medical treatment. *See id.* at 347. However, a prison official's conduct does not constitute deliberate indifference unless it is accompanied by the requisite mental state. Specifically, "the official [must] know ... of and disregard ... an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). While a plaintiff must allege that the official was subjectively aware of the requisite risk, he may demonstrate that the prison official had knowledge of the risk through circumstantial evidence and "a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id* at 842.

*4 As noted above, it is undisputed that plaintiff was cut by the teeth of another inmate while in the yard. (D.I.2) The medical notes reflect the wound was cleaned and TYLENOL was given for pain. (D.I.16, Ex. B) Defendant Dr. Ivens was "contacted".*Id.* About two hours later, steri-strips were applied and plaintiff was instructed to "minimize flexing of [his] arm." *Id.* The following day, plaintiff was given a Diptherea-Tetanus shot. This is the last entry in the medical notes related to this injury.

While plaintiff states a nurse applied the treatments, he does not name this individual as a defendant. Instead, the medical notes refer to only one named defendant-Dr. Ivens. *Id.* Still, plaintiff does not assert any complaints about the care provided by Dr. Ivens. The medical notes reflect treatment, medication and follow-up care were provided. The record is devoid of facts suggesting defendant Ivens acted with deliberate indifference to a serious medical condition. The decision of whether to test for HIV is a medical determination left to the discretion of a physician and not the court. Accordingly, the court

grants defendant Ivens' motion for summary judgment.

C. Respondeat Superior

Turning to the remaining defendants, plaintiff's theory of liability is premised on the doctrine of respondeat superior since all of the defendants hold a supervisory position and are not addressed with particularity in the complaint. Section 1983 actions, however, do not recognize liability under a theory of respondeat superior. *See Durmer v. O'Carroll,* 991 F.2d 64, 69 n. 14 (3d Cir.1993). Thus, a private entity cannot be vicariously liable for its employees' deprivations of other's civil rights. *See Rouse v. Plantier,* 182 F.3d 192, 200 (3d Cir.1999). Private corporations dispensing medical services can be held liable, however, for a "policy" or "custom" that demonstrates deliberate indifference. *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658 (1978). In order to hold PHS liable, therefore, plaintiff must show that PHS has an established "policy" or "custom" that resulted in a deliberate indifference to plaintiff's serious medical needs. *See Lawson v. Correctional Officer Burns,* Civ.A.No. 94-0780, 1994 WL 583264, at *2 (E. D.Pa. Oct. 24, 1994).

The essence of plaintiff's complaint is that his cut was not properly treated and he was not given an HIV test. Assuming it was PHS personnel who made the decision not to provide further treatment and not to administer an HIV test, the question is whether this decision constitutes a "policy" or "custom" that demonstrates a deliberate indifference to serious medical needs. Plaintiff admits that he was examined and received treatment for his cut, although not the treatment he deems most appropriate. The decision not to use stitches, therefore, is not a "policy" or "custom", as those terms are commonly understood,[FN5] but merely a disagreement over the course of medical treatment which does not rise to a constitutional issue. Indeed, courts grant prison authorities a significant amount of "latitude in the diagnosis and treatment of prison-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)

Page 6

ers."*Durmer,* 991 F.2d at 67. Accordingly, plaintiff's claim against PHS shall be dismissed.

> FN5. A "policy" is a course of action meant to determine future decisions, while a "custom" is a course of action customarily repeated.

**\*5** Turning to defendants Fish, Taylor, and Williams, plaintiff proffers no specific allegations of alleged misconduct. He never mentions them in the body of his complaint. (D.I.2) Given that each is a supervisor, it is evident he wishes to hold them liable in their supervisory positions. However, supervisors cannot be held liable for actions conducted in their supervisory roles. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Durmer v. O'Carroll,* 991 F.2d 64 (3d Cir.1993); *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). Therefore, summary judgment for these defendants is appropriate.

D. Motion for Appointment of Counsel

Plaintiff contends appointment of counsel is warranted since the case is complex, he is unskilled in the law and it is likely he will prevail on the merits. (D.I.15) A *pro se* litigant proceeding *informapauperis* has no constitutional nor statutory right to representation by counsel. *SeeRay v. Robinson,* 640 F.2d 474, 477 (3d Cir.1981). Typically, *pro se* litigants are afforded counsel, if at all, only after a threshold evaluation of the merits of their case. *SeeTabron* at 155. In light of the court's finding that summary judgment is appropriate for all defendants, plaintiff's motion for appointment of counsel is denied.

V. CONCLUSION

For the reasons stated, defendants' motions shall be granted. An appropriate order shall issue.

ORDER

At Wilmington this 21st day of September, 2001,

consistent with the memorandum opinion issued this date;

IT IS ORDERED that:

1. Defendants' motions to dismiss (D.I.13, D.I.16) are granted.

2. Plaintiff's motion for appointment of counsel (D.I.15) is denied.

3. The Clerk is directed to enter judgment in favor of defendants and against plaintiff.

D.Del.,2001.
Gregory v. PHS Inc.
Not Reported in F.Supp.2d, 2001 WL 1182779 (D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.